UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| **Annette H. Ardis,** | Civil Action No.: 3:26-cv-300-SAL |
| **Plaintiff,** | |
| v. | **COMPLAINT** |
| **JPMorgan Chase Bank, N.A.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## COMPLAINT

1. This is an action brought by Plaintiff, Annette H. Ardis, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (hereinafter "FCRA"). Plaintiff also seeks compensatory and punitive damages for the Defendant's violations of South Carolina common law set forth herein.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

1

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7. This Court has Jurisdiction under 15 U.S.C. §1681p and 28 U.S.C. §1331.

8. Venue is proper in the Columbia Division because the Plaintiff resides in Lee

County, and the Defendant transacted business here.

## PARTIES

9. Plaintiff, Annette H. Ardis, is a resident and citizen of the State of South Carolina, Lee County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10. Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is an Ohio National Association that may be served with process through its registered agent for service of process, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219. Defendant JPMCB was in all respects and at all times relevant herein doing business in the state of South Carolina.

11. JPMCB is a furnisher of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that it regularly reports account data on consumer credit cards.

## FACTUAL ALLEGATIONS

12. In 2019, Plaintiff first became the victim of identity theft and had accounts opened in her name without her knowledge or permission.

13. In 2020, Plaintiff filed a police report, filed an identity theft affidavit with the Federal Trade Commission, and placed a fraud alert on all of her credit reports.

14. On or about March 30, 2020, Experian sent Plaintiff a postcard confirming a fraud alert had been placed on her Experian credit reports.

15. On or about March 30, 2020, TransUnion sent Plaintiff a postcard confirming a

fraud alert had been placed on her TransUnion credit reports.

16. On or about March 31, 2020, Equifax sent Plaintiff a letter confirming the fraud alert had been placed on her Equifax credit reports.

17. In 2024, Plaintiff began receiving debt collection letters in the mail for credit card accounts that did not belong to her. This was extremely frightening and stressful to Plaintiff because she did not have or use credit cards. In fact, Plaintiff has always been adamant about only using cash or checks as forms of payment.

18. In February 2025, worried that she was again the victim of identity theft, Plaintiff tried to obtain copies of her credit reports online. Unfortunately, when Plaintiff tried to obtain a copy of her Equifax credit report, she was denied access. When Plaintiff tried to obtain a copy of her TransUnion credit report, she could not answer the identity verification questions because the questions contained information known only to the identity thief.

19. Subsequently, Plaintiff learned that the identity thief was living at 427 New Castle Road, Greenville, South Carolina. Plaintiff also learned the thief paid an electricity bill with one of the fraudulent credit cards opened in Plaintiff's name.

20. On or about February 7, 2025, Plaintiff called the credit reporting agencies to request copies of her credit reports.

21. On February 7, 2025, Plaintiff filed a police report with the Lee County Sheriff's Office.

22. On February 7, 2025, Plaintiff filed an Identity Theft Report with the Federal Trade Commission wherein Plaintiff provided the address used by the identity thief to open the fraudulent accounts. Plaintiff also provided the police officer's name and report number

for Plaintiff's police report.

23. On or about February 25, 2025, Plaintiff finally received a copy of her Equifax credit report in the mail and learned that it was full of inaccurate information. Specifically, JPMCB Card Services, Acct. No. *2986 (hereinafter referred to as the "Account") was reporting as a charged-off account belonging to Plaintiff with $687 past due.

24. Plaintiff never opened an account with Defendant, nor did she ever apply to have a credit card issued to her by Defendant.

25. On or about February 25, 2025, Plaintiff received a copy of her Experian credit report. Upon review of her credit report, Plaintiff learned she had a FICO score of 565, which was labeled as poor. She also discovered that numerous fraudulent accounts were reporting on her credit, as well as an address where she had never lived, three variations of her social security number, and two phone numbers, none of which belonged to Plaintiff.

26. Plaintiff's February 25, 2025, Experian credit report specifically showed Defendant was reporting the Account as a charged-off account belonging to Plaintiff with $687 written off and $687 past due as of February 2025.

27. On or about February 25, 2025, TransUnion sent Plaintiff a letter stating it was unable to locate a credit report for Plaintiff based on the information she provided. Plaintiff was asked to provide copies of two documents to verify her current address, Social Security number, and date of birth.

28. Plaintiff immediately forwarded TransUnion a copy of her driver's license and her Social Security benefits statement.

29. On or about March 16, 2025, Equifax sent Plaintiff a letter stating an initial fraud

alert had been added to Plaintiff's Equifax credit file.

30. On or about March 16, 2025, TransUnion sent Plaintiff a second letter requesting proof of her current mailing address.

31. On or about March 24, 2025, Plaintiff sent a dispute letter to Equifax ("First Equifax Dispute") stating the Account was a fraudulent account opened in Plaintiff's name without her knowledge and asking that it be removed from her credit report. With her dispute, Plaintiff included her address, full Social Security number, and date of birth. Equifax received Plaintiff's dispute on March 28, 2025, and thereafter forwarded same to Defendant.

32. On or about March 24, 2025, Plaintiff sent a dispute letter to Experian ("First Experian Dispute") stating she had been the victim of identity theft and fraud, and the Account was a fraudulent account opened in her name by a woman who stole her identity. Plaintiff requested Experian remove the Account from her credit report. Plaintiff provided her address, full social security number, and date of birth in her letter, and requested Experian add a fraud alert to her credit file. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

33. On or about March 24, 2025, Plaintiff mailed TransUnion a completed Alert Request Form along with a copy of her driver's license and Verizon telephone bill.

34. On or about March 29, 2025, TransUnion sent Plaintiff a postcard informing her a fraud alert had been added to her TransUnion credit report.

35. On March 29, 2025, Equifax sent Defendant an Automated Consumer Dispute Verification ("ACDV") informing Defendant that Plaintiff disputed the Account as "True

6

Identity Fraud," "Account fraudulently opened." Equifax also informed Defendant that Plaintiff disputed the former address of 427 New Castle Rd, Greenwood, SC. In response to Equifax's ACDV, Defendant, by and through its employee Xavier Fernandes, verified the Account as accurate with the disputed address of 427 New Castle Rd. As a result, the Account continued to be reported as a charged off account belonging to Plaintiff on Plaintiff's Equifax credit report.

36. On or about March 30, 2025, Equifax sent Plaintiff a letter stating it was unable to locate a credit file in its database with the identification information Plaintiff provided. Equifax requested Plaintiff send them two different items – one to verify Plaintiff's identity and the other to verify her current address. Thereafter, Plaintiff mailed Equifax another copy of her driver's license.

37. On April 2, 2025, TransUnion received Plaintiff's Alert Request Form and proof of identity and address but never provided Plaintiff with a copy of her TransUnion credit report.

38. On or about April 17, 2025, Equifax sent Plaintiff a letter including a copy of "Remedying the Effects of Identity Theft" prepared by the CFPB.

39. On or about May 25, 2025, Experian sent Plaintiff a postcard confirming an initial security alert had been added to her Experian credit file.

40. On or about May 25, 2025, Experian also forwarded its Dispute Results to Plaintiff stating its reinvestigation of Plaintiff's disputes was now complete. Experian informed Plaintiff that since it had forwarded the February 25, 2025, credit report to Plaintiff, Experian had discovered an inaccuracy. Accordingly, Experian stated it was providing

Plaintiff with a new credit report with the inaccuracy corrected. However, Experian did not disclose to Plaintiff what information was corrected. Upon review of the Investigation Results and credit report, the Account reported by Defendant was still reporting on Plaintiff's credit report as a derogatory, charged off account belonging to Plaintiff.

41.  On or about June 13, 2025, Plaintiff sent a second dispute letter to Equifax ("Second Equifax Dispute"). Plaintiff informed Equifax she had mailed a copy of her driver's license and still had not received a response to her First Dispute. Plaintiff again informed Equifax she had been the victim of identity theft and fraud, and requested Equifax remove the fraudulent Account from her credit report. Plaintiff provided Equifax with another copy of her driver's license and a copy of her 2022 Social Security Benefit statement showing her social security number. Plaintiff's address, date of birth and full social security number were also provided in her letter. Equifax received Plaintiff's second dispute on June 18, 2025, and thereafter forwarded same to Defendant.

42.  On or about June 13, 2025, Plaintiff sent a second dispute letter to Experian ("Second Experian Dispute") stating she had received the results of Experian's reinvestigation into her disputes, but the fraudulent Account continued to be reported on her credit report. Plaintiff again told Experian she had been the victim of identity theft and fraud and disputed the Account as a fraudulent account opened by the identity thief. Plaintiff provided Experian with a copy of the police report she had filed regarding the theft of her identity. Plaintiff also provided Experian her address, date of birth and full social security number in the letter. Experian received Plaintiff's second dispute and police report on June 18, 2025, and thereafter forwarded both to Defendant.

43. On or about June 13, 2025, frustrated that she had still not been able to obtain a copy of her TransUnion credit report, Plaintiff sent a dispute letter to TransUnion ("First TransUnion Dispute"). In her letter, Plaintiff specifically informed TransUnion that she had never received a copy of her TransUnion credit report even after mailing TransUnion proof of her identity. Plaintiff informed TransUnion she had been the victim of identity theft and fraud, and requested TransUnion remove the fraudulent Account from appearing on her credit report. Plaintiff provided TransUnion her address, Social Security number, date of birth, and a copy of her driver's license. Additionally, Plaintiff requested TransUnion send her a complete copy of her credit report. TransUnion received Plaintiff's dispute on June 18, 2025, and thereafter forwarded same to Defendant.

44. On or about June 18, 2025, TransUnion sent Plaintiff a letter regarding Remedying the Effects of Identity Thef and setting out some of her rights under the Fair Credit Report Act.

45. On or about July 9, 2025, TransUnion sent Plaintiff its Investigation Results wherein TransUnion informed Plaintiff that Defendant verified the Account as accurate. Accordingly, the Account continued to be reported on Plaintiff's TransUnion credit report as a derogatory, charged off account belonging to Plaintiff.

46. On or about July 9, 2025, five months after Plaintiff first requested it, TransUnion finally provided Plaintiff with a copy of her TransUnion credit report. Upon review, Plaintiff was devastated to learn her credit report contained several fraudulent accounts, including the Account reported by Defendant.

47. On or about July 11, 2025, Equifax forwarded its Reinvestigation Results to Plaintiff.

9

In these Results, Equifax informed Plaintiff that the disputed Account was not currently reporting on Plaintiff's Equifax credit file.

48. On or about July 13, 2025, Experian forwarded its Dispute Results to Plaintiff. In these results, Experian informed Plaintiff that with regard to the Account, Defendant had certified to Experian that the information was accurate. As a result, the Account continued to be reported as a derogatory account belonging to Plaintiff.

49. On or about July 31, 2025, Plaintiff sent a dispute letter to Defendant. In her letter, Plaintiff informed Defendant she had been the victim of identity theft and fraud, and that multiple accounts had been opened in her name without her knowledge. Plaintiff specifically disputed the JPMCB Card Services, Account Number 426684161939****, as a fraudulent account and asked Defendant to remove the Account from her credit reports. Plaintiff also requested that Defendant send her a copy of the application used to open the fraudulent Account, as well as every statement for the Account. Plaintiff provided Defendant with her address, date of birth, and full social security number.

50. Defendant received Plaintiff's dispute letter on August 4, 2025.

51. Defendant never responded to Plaintiff's July 31, 2025, dispute letter to Defendant.

52. On or about July 31, 2025, Plaintiff sent a third dispute letter to Experian ("Third Experian Dispute") stating she had received Experian's investigation results, but the fraudulent Account was still reporting on her credit report. Plaintiff again disputed the Account as a fraudulent account and asked for it to be removed from her credit report immediately. With her dispute, Plaintiff provided another copy of her police report. Experian received Plaintiff's third dispute and police report on August 5, 2025, and

thereafter forwarded same to Defendant.

53.    On or about July 31, 2025, Plaintiff sent a second dispute letter to TransUnion ("Second TransUnion Dispute").  In her letter, Plaintiff stated she had received TransUnion's Investigation Results, but that TransUnion was still reporting the fraudulent Account as belonging to Plaintiff.  With her dispute, Plaintiff provided TransUnion a copy of the police report she filed regarding the theft of her identity and another copy of her driver's license.  TransUnion received Plaintiff's second dispute on August 5, 2025, and thereafter forwarded same to Defendant.

54.    On or about August 6, 2025, Experian forwarded a letter to Plaintiff, wherein Experian stated it had received Plaintiff's dispute, but didn't believe it actually came from Plaintiff.  As a result, Experian refused to take any action on Plaintiff's disputes.  Plaintiff was instructed that, if inaccurate information was on her credit report, she should call Experian at 833-421-3400.

55.    On or about August 6, 2025, in response to Plaintiff's dispute and police report, TransUnion sent Plaintiff correspondence admitting it had received Plaintiff's request to block the Account due to fraud, but refusing to do so.

56.    On or about August 9, 2025, Defendant sent a letter to Plaintiff stating that after researching Plaintiff's concerns, Defendant had confirmed that Plaintiff was responsible for the Account.  Defendant stated its decision was based on the credit card being sent to an address Plaintiff allegedly confirmed before her fraud claim and the card not being returned.

57.    On or about August 11, 2025, Equifax sent Plaintiff a letter stating it had received

Plaintiff's police report and request to block the Account from her credit file, but Equifax refused to block the Account.

58. On or about August 28, 2025, TransUnion sent Plaintiff its Investigation Results showing that the Defendant verified the Account as accurate and updated the information being reported. Accordingly, TransUnion continued reporting the derogatory fraudulent Account as belonging to Plaintiff on her credit report.

59. On or about September 8, 2025, Defendant sent Plaintiff a second letter informing her the review of Plaintiff's fraud claim had been completed and it was determined that Plaintiff was responsible for the Account. Defendant never provided Plaintiff with a copy of the application or any statements on the Account, despite her repeated requests for same.

60. On September 9, 2025, Plaintiff called Experian at the number provided in Experian's August 2, 2025, letter to Plaintiff. During this call, Plaintiff spoke with Michelle and two other representatives. With each person, Plaintiff explained she was the victim of identity theft and she needed the fraudulent accounts, including Defendant's Account, removed. Experian's employees told Plaintiff she needed to contact the individual creditor because there was nothing Experian could do. Experian's employees specifically admitted to Plaintiff that all Experian does is forward her dispute to the company and if the company verifies the account, it remains on the credit report.

61. On or about September 9, 2025, Plaintiff sent TransUnion a third dispute letter ("Third TransUnion Dispute") stating she had received TransUnion's Investigation Results and TransUnion's letter wherein TransUnion refused to block the reporting of the fraudulent Account. Plaintiff again requested that TransUnion remove the Account as it

was a fraudulent, and enclosed another copy of the police report she had filed and her driver's license. TransUnion received Plaintiff's third dispute on September 15, 2025, and thereafter forwarded same to Defendant.

62. On or about September 17, 2025, TransUnion sent Plaintiff correspondence stating it had received Plaintiff's second fraud block request for the Account. Despite receipt of Plaintiff's valid police report, TransUnion again refused to block the fraudulent Account from Plaintiff's credit report.

63. On or about October 10, 2025, TransUnion sent Plaintiff Investigation Results showing that Defendant had again verified the Account as accurate. Accordingly, despite repeated receipt of Plaintiff's police report, TransUnion continued reporting the fraudulent Account as belonging to Plaintiff on her credit report.

64. To date, Defendant continues to report the derogatory, fraudulent Account as belonging to Plaintiff to the credit reporting agencies as well as to numerous third parties.

65. From at least October 2019 through the present, Defendant has reported false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties. During the past two years while Defendant was reporting the fraudulent Account as belonging to Plaintiff, said information was provided to and/or viewed by FebDestiny, Capital One, Credit Fresh Marketing, TBOM/Aspire, T-Mobile, Cap One Auto, The Hartford, Synovus/Verv-FirstDigital, OneMain Financial, Tab BankNetCredit, QuinStreet, AXCSSFN/CNGO, CBW/Credit Fresh, Clarity Services, Inc., Clarity/Advance Financia, Clarity/CBW/Credit Fresh, Clarity/CNU Online Holdi, Clarity/Finwise-OppLoans, Conn Appliances, Inc.,

Montgomery Ward/DM Serc, Resurgent Capital Servic, Seventh Avenue/Dm Servi, Unknown, MDG USA Inc, Leadsmarket.com LLC, Summit Management Company, LLC, Finance, Verizon, and ConsumerInfo.com.

66. Defendant's knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-0952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

## COUNT ONE
### (Fair Credit Reporting Act)

67. The Plaintiff adopts the averments and allegations of paragraphs 12 through 66 hereinbefore as if fully set forth herein.

68. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information said Defendant had provided to a consumer reporting agency.

69. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

70. Defendant negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

71. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

72. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account the subject of this action was inaccurate, incomplete, false, and misleading.

73. The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

74. Defendant completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA. Instead, Defendant simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as fraudulent, even after Defendant received Plaintiff's police report.

75. As a result of Defendant's violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe and unrelenting anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish. Additionally, the damage to Plaintiff's credit score and credit reputation caused her to not receive promotional offers of credit. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

76. In addition, Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendant alleged herein, would not have been necessary.

77. Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT TWO
### (Fair Credit Reporting Act)

78.     The Plaintiff adopts the averments and allegations of paragraphs 12 through 77 hereinbefore as if fully set forth herein.

79.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information Defendant had provided to a consumer reporting agency.

80.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

81.     Defendant willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by Defendant to a consumer reporting agency.

82.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agency.

83.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account the subject of this action was inaccurate, incomplete, false, and misleading.

84.     As a result of Defendant's violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe and unrelenting anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss

of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish. Additionally, the damage to Plaintiff's credit score and credit reputation precluded her from receiving promotional offers of credit. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

85. Due to Defendant's willful violations of the FCRA, Plaintiff's entitled to punitive damages in an amount to be determined by the jury.

86. In addition, Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendant alleged herein, would not have been necessary.

87. Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT THREE
### (Defamation, Libel, and Slander)

88. The Plaintiff adopts the averments and allegations of paragraphs 12 through 87 hereinbefore as if fully set forth herein.

89. Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

90. Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account the subject of this action as said Account was clearly fraudulent.

91. Defendant's false and defamatory statements have harmed the reputation of Plaintiff

and/or deterred third persons from associating with Plaintiff. Specifically, Defendant reported the Account to the national credit reporting agencies as belonging to Plaintiff so the Account would appear on Plaintiff's credit reports. Plaintiff's credit reports were viewed by numerous third parties as set out above and Plaintiff suffered damages.

92. Defendant communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account the subject of this action.

93. At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

94. As a result of Defendant's intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public at large, and was forced to endure credit reporting of the Account in spite of the fact that Plaintiff did not owe the Account as it was fraudulently opened in her name without her knowledge or permission.

95. As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame, and made to suffer humiliation, anxiety, stress, headaches, loss of sleep, anger, worry, physical sickness, loss of enjoyment of life, and mental anguish for which she claims compensatory and punitive damages.

## **AMOUNT OF DAMAGES DEMANDED**

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A. Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1).

B. Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C. Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3);

D. Compensatory and punitive damages for Defendant's defamation, libel and slander of Plaintiff;

E. For this matter to be heard by a jury; and

F. For such other and further relief as this Court deems necessary and proper.

/s/ *Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
**HAYS CAULEY, P.C.**
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com
*Attorney for Plaintiff*

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

/s/ *Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**
JPMorgan Chase Bank, N.A.
c/o CT Corporation System – Registered Agent
4400 Easton Commons Way, Suite 125
Columbus, OH 43219